
FILED

2008 Sep-30  PM 03:50
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

FELISHA JELKS, ANDREA           )
CHAMPION, and BECKY             )
BAKER,                          )
                                )
        Plaintiffs,             )
                                )          4:06-cv-00526-RRA
vs.                             )
                                )
DECATUR PLASTIC                 )
PRODUCTS, INC.,                 )
                                )
        Defendant.              )

<u>MEMORANDUM OF OPINION</u>

This is a civil action, in which the second amended complaint alleges gender discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* (count one), race discrimination in violation of Title VII and 42 U.S.C. § 1981 (count two), retaliation in violation of Title VII and 42 U.S.C. § 1981 (count three), and violations of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.* This case is before the court on defendant Decatur Plastics, Inc.'s motion for summary judgment.

In reviewing a summary judgment motion this court must

> view[] the evidence in the light most favorable to the nonmoving party. *Skrtich v. Thornton*, 280 F.3d 1295, 1299 (11th Cir.2002). Summary judgment is appropriate if the pleadings, depositions, and answers to interrogatories, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Eberhardt v. Waters*, 901 F.2d 1578, 1580 (11th Cir.1990).

*McCarley v. KPMG Intern.*, No. 08-10708, 2008 WL 4195152, *2 (11th Cir. September 15,

2008).

FACTS

Decatur Plastics, which employs about 250 people, opened its Gadsden, Alabama facility in January, 2005.  The defendant began taking applications and conducting employee interviews in January, 2005.  During the plaintiffs' employment, the defendant supplied parts to Delphi for Mercedes, then the defendant's only customer in Alabama.  The defendant's owner, John Kussman, sent the division general manager, Jamie Messer, to Alabama to set up the new plant.  Messer worked as plant manager in the Alabama plant from January 2005 through October 2005.  Chris McCain became the quality assurance manager in February 2005, and he held that position for the remainder of the plaintiffs' employment.  Messer was involved in supervising, training, and working with new employees.

*Policy for reporting discriminatory practices*:  The defendant is an equal opportunity employer. The defendant's employee handbook states that if an employee thinks he or she has been discriminated against on the basis of race, religion, color, sex, national origin, disability or veteran status, that employee   "should inform the Human Resources Department." (Employee Handbook, Section 6.0.)  Although Jelks testified that "we did not receive an employee handbook" (Jelks Depo. 117-118), she signed a receipt acknowledging receipt of the handbook.  Becky Baker testified that she did not get a handbook when she was hired.  (Baker Depo. 49.)[1]

---

[1] The defendant cites Baker's deposition in support of the statement that Baker acknowledged in writing receipt of an employee handbook. (Deposition of Baker, pp. 173-174, attached as 'Exhibit H')  No such evidence has been submitted. Baker's deposition ends at page 144.

During employee orientation, the company usually reviews its written sexual harassment policy with employees. (Hall Depo. 101-104.) However, the defendant's human resources administrator, Darla Hall, states that she did not know if the policy was in place when the plaintiffs were hired. *Id.* at 104. Human resources manager, Mandy Bell, stated in an affidavit that the company's policy regarding sexual harassment has been in effect "at all times during plaintiffs' employment." (Bell Affid. 3.) There is no evidence that this policy was actually reviewed with the plaintiffs at the time of their hiring. Hall testified that employees were told that if they were victims of discrimination, one of their options was to go to the EEOC. (Hall Depo. 99.)

Messer did not know if the company had a racial harassment or race discrimination policy, and Christ McCain, Champion's supervisor, never received training on the subject of racial harassment or racial discrimination. McCain learned that Champion had an interracial child shortly after she began work with the defendant, when she showed him pictures of her child. Thereafter Messer talked to her about the child. The plaintiff testified, Word for word, he asked me what in the world possessed me to start dating black men and how did I think I was doing my son by having a half black child? What did I think I was going to put him through in life." (Champion Depo. 109.) There is no evidence as to when this occurred or if this type of statement was ever made again.

Champion further testified:

I know there was a concert going on here in town. There was a flier that had a black woman in a G-string. One of the guys [a black man] that was flocking had it set up on the box that was behind his flock machine and –
. . . .

> Mr. Messer walked up and got it and said . . . "Damn at the ass on that black chick."
> And I remember him making a statement to me and asked me if I wouldn't be making
> more money doing what she's doing. . . . And I remember him making a statement
> that – about black women's . . . booties.

(Champion Depo. 175-177.)  There is no evidence as to when this statement was made, or
if any statements like it were repeated.

Champion recalls Messer using the term "nigger" at least twice a week; telling racially
offensive jokes; quite a few times calling black females in the plant "nigger bitches"; calling
a black employee a "nigger bitch" when he was upset; and declaring there were some "lazy
nigger bitches in the plant." (Champion Depo. 175-177, 179-184.)

Plaintiffs Champion and Jelks both recall one particular joke Messer told in their
presence. He asked, "What does "'Pontiac' stand for?" Hee answered, "Poor Nigger thought
he had a Cadillac." (Jelks Depo. 132; Champion Depo. 181.)  Champion remembers Messer
making a "lot of jokes, about, you know, women supposed to be at home barefoot and taking
care of the kids and stuff along those lines." (Champion Depo. 177.)

Jelks remembers Messer telling her that the Klux-Klux-Klan originated in his home
state of Indiana; that he was not used to working around black people; that he was
accustomed only to white and Mexican employees; and that there were only around six (6)
black employees out of the one hundred and eighty (180) employees at the Indiana facility.
(Jelks Depo. 132-133; Kussman Depo. 41; Hall Depo. 79.)  Not long after April 18, 2005,
Jelks heard Messer refer to an African American employee as a "Jigaboo." (Jelks Depo. 126,
130, 131.)

Champion testified that Messer complained about the original human resources

4

manager, Barbara Thomas, because she would hire "people that wouldn't keep a job -- black people." She stated that "he made the comment 'black people' and cut his eyes," and talked about '[s]ome of these blacks that don't want to work.'" (Champion Depo. 75-76.)

McCain testified that Champion never referred to her or any other white female as "girl." (Champion Depo. 43-44, 69-72,75-76, 182-183.)  Champion testified she spoke to Mary Ann Snyder, who worked in human resources, and to Messer about Messer's comments. She also told owner Kussman "that there was some racial influential going around the plant that he needed to talk to his management about because it was coming out of their mouths." (Champion Depo. 78-82.)

When McCain, who was younger than Baker, kept referring to her as a "girl," Baker explained to McCain, in March 2005, that it upset her to be called a "girl" because she took it as a "derogatory, racist comment."  Although McCain apologized to Baker, he continued to call her and other black females "girls."  (Baker Depo. 97-101; Champion Depo. 43.)

*Felicia Jelks*: Felicia Jelks, a black female, was hired by Decatur Plastics when the plant opened on January 7, 2005, at $6.25/hour.[2] Jelks was employed as a "flocker," which is a Grade 4 position.  Flockers apply a nylon coating having an electromagnetic charge to a glove box for a Mercedes Benz automobile after it has been sprayed with an adhesive by another employee called a "sprayer."  She was eventually terminated by the defendant on May 25, 2005.

Earl Smith, a white male, served as Jelks' initial immediate supervisor until he

---

[2]The plaintiffs dispute this fact but cite only to "Pls.' Exs. 7 & 13." These exhibits do not appear in the court records.

voluntarily stepped down on March 1, 2005. Vanessa Lewis, a black female, served as Jelks' second supervisor until April 2, 2005.  Lewis eventually left the position as well. Messer moved the second shift supervisor, a white male whom Messer had recently hired, Josh Tidwell, into the supervisor's slot vacated by Lewis. (Messer Depo. 55-57; Tidwell Depo. 22-23,25.)

At some point, Jelks expressed interest in the flock technician position (Flock Tech), which is a grade position requiring some skill and experience. (Hall Depo. 89-90.)  Flock tech openings were not posted in the plant.  However, there is no evidence that they were required by company policy or rule to be posted.

A flock tech is required to "perform preventive maintenance on equipment" and to "rebuild equipment as required." (Job Description for Flocking Technician.)  Messer knew Jelks was interested in the flock tech position, but Jelks did not have any experience in operating spray equipment, mechanical repair, or maintenance work on equipment.  (Messer Depo. 24-25; Hall Depo.  90-91.)  Messer admitted that "little consideration" was given Jelks. (Messer Depo. 25.)

Messer hired Jeff Morgan, a white male, for the position.  Messer hired Morgan because of his extensive experience with painting and operation of paint equipment, such as like the one he would use as a flock tech.  (Messer Depo. 20-21.)  The glue gun used by a flock tech and the paint gun used by Morgan in his previous jobs were very similar.  Id.[3]  Morgan's

---

[3]The plaintiffs disputes this fact in part because one gun shot paint and the other shot adhesive.  There is no evidence that the guns themselves, and their operation, were not similar however.

experience, knowledge, and background in the use and operation of spray equipment were important factors in Messer's decision to hire Morgan for the Flock Tech. position. *Id.* at 19-21.   However, he had no prior flocking experience, and he required additional training after he took the position. The Alabama Plant has never had a female flock tech.

Jelks testified that Messer told her it was her job to show new flockers, who finished the Gadsden training classes, how to do the flocking job. (Jelks Depo. 53-55).   The plaintiffs contend that this was also a primary function of a flock tech.   Messer, McCain, Bell, and Tidwell all agreed that Jelks performed well as a "flocker."[4] However, Messer observed that Jelks had attendance problems,  production problems, and "being off the line" problems.  *Id.* 25-27, 31.   He also had concerns about the attitude and ability of Jelks to work and to cooperate with co-employees. *Id.* At the time Jelks worked at the plant, the flockers, including Jelks, were not getting along.  *Id.*  Messer could not discern the cause of the friction.  *Id.* at 26-30.

The parties agree that to gain experience with the spraying equipment, the best position for Jelks would be the sprayer position.  Sometime after not getting the flock tech job, Jelks asked for a lateral move to the sprayer position. Messer told Jelks that "the parts are for a man to handle [and] that a woman should not work in that position," and that "that job was not for women. It was only for men." (Jelks Depo. 136,139.)  Messer testified that he may have had a conversation like this with the plaintiff.  (Messer Depo. 116-117.)  Tidwell testified that the physical demands on a flocker are about even with that of a sprayer, but he noted that the

---

[4]As opposed to a flock tech, which Ms. Jelks never was.

sprayer's job may be more demanding.  (Tidwell Depo. 51.)

On April 15, 2005, Jelks received an employee evaluation.  Jelks' employee evaluation was signed by Tidwell and Messer and dated April 15, 2005.  It was signed by Jelks on April 18, 2005.  Tidwell testified that he did not fill out the form, but merely signed it and went over it with Jelks.  The discretionary raise had been written over and lowered from thirty cents an hour to twenty cents an hour.[5]  Tidwell testified that if he made the changes to Jelks' evaluation, including lowering her raise, then it was pursuant to Messer's or human resources' instructions.  (Tidwell Depo. 102.)

Jelks testified that she met with Kussman on April 18, 2005 and informed him that she felt Messer was discriminating against her because she was black and a woman. Jelks further testified that she listed for Kussman the following evidence of such discrimination: (1) men were being paid more than women, (2) whites were making more than blacks, (3) Messer was assigning her to bad machines to hinder her production, and (4) she was entitled to a shift differential. (Jelks Depo. 72-73, 86, 90.)  Kussman told Jelks he would  get with Messer and talk to him about some of her complaints.

Shortly after her conversations with Kussman, Jelks confronted Messer when she heard him refer to a black employee as a "Jigaboo."  Messer responded he was not a racist because he listened to "black music." (Jelks Depo. 86,98, 131.)

Messer testified to having several conversations with Josh Tidwell concerning Jelks and instructed him to "watch her a little closer" and report back to him. (Messer Depo. 34-35.)

---

[5]Apparently Vanessa Lewis gave the discretionary increase. (Tidwell Depo. 104.)

Tidwell was at least one of the supervisors over Jelks at the time of her termination on or about May 25, 2005. (Tidwell Depo. 28-29; Messer Depo. 41-42.) According to Tidwell, Jelks was supposed to stay on the line until the first shift ended at 3:30 p.m. (Tidwell Depo. 78, 82.) At about 3:15 p.m. on the day in question, Tidwell noticed that the production line was not running parts. *Id.* at 77. There is one sprayer and one flocker on each shift. Both have to work for the line to run.

On this date, Tidwell observed that the sprayer was at his work station, but Jelks was not at hers. *Id.* at 111-114. Tidwell went to look for Jelks, (Tidwell Depo. 77-78), and found her sitting in her car before the end of her shift. When he told her to return to work, she refused and said she was finished for the day. Jelks denies the accuracy of this part of Tidwell's testimony. (Jelks Depo. 144-145.) Jelks states that Tidwell found her getting her broom to clean up at 3:15, and that she clocked out at 3:30, the end of her shift. It is undisputed that the production line did not run from 3:15 to 3:30. (Tidwell Depo. 110.)

Tidwell recommended termination on the ground of insubordination. Messer concurred. (Defendant's Response to Interrogatories 5.) Based on what Tidwell told Messer, Messer believed that it was a clear case of insubordination. (Messer Depo. 42.) The evidence shows that another employee, Adam Hawkins, had gone out to his car during work hours, and he was terminated by Tidwell. Hawkins is white.

On Wednesday morning of May 25, 2005, Tidwell stopped Jelks before she could clock-in. He took her to the human resources office, where Hall handed Jelks her termination paper, which had been prepared by Tidwell, and told Jelks to leave the building. (Jelks Depo. 145-146, 150; Bell Depo. 84.) Jelks refused to sign the termination report. She stated that she

9

did not have the opportunity to check the disagree box or make a statement because "they were going to call the police." (Jelks Depo. 149-151.)  The defendant's status report stating the reason for Jelks' termination as "terminated/insubordination.  Refused to return to work after she had clocked out early and went to sit in her car." Payroll records show that Jelks clocked out at 3:30 p.m., the end of her shift.  Hall testified that Jelks told her she had gone to her car to get headache medicine.

The defendant has a progressive disciplinary system and a policy of keeping records of any policy violations by an employee. Tidwell knew the company policy instructing him to issue verbal warnings and write-ups.  Tidwell testified that it is in his *discretion* to issue such write-ups and to give such warnings. Tidwell testified he never wrote up Jelks or had discussions with Jelks about her conduct before she was terminated. (Tidwell Depo. 98, 158-159.)

At the time of Jelks' termination, Tidwell did not know that Jelks or any of the plaintiffs had ever filed an EEOC charge or complained about discrimination.  (Tidwell Depo. 69-70.) When asked if, at the time they were working, he knew that the plaintiffs had filed EEOC charges, Messer stated: "I don't know if I knew that while they were still working with us." (Messer Depo. at 123.)

In her EEOC charge, dated June 16, 2005, Jelks stated, "On May 25, I was discharged for sitting in my car prior to the end of the shift and refusing to work —  and refusing to return to the work area until the shift ended."  (Amended  EEOC Charge dated June 16, 2005.)  Nowhere in her charge or supplemental charge does Jelks deny the truthfulness of the given reason for her discharge.

10

Jelks and Tony Mashburn, a white male, both allegedly committed Group C offenses. Mashburn got drunk and was fired, but Messer rehired him on May 12, 2005, and gave him a raise on May 16, 2005. In total, Jelks worked for the defendant about 4½ months.

*Andrea Champion*:  Champion, a white female, worked for Decatur Plastics from on or about January 7, 2005 until on or about April 22 2005.  She worked for the defendant a total of about 3½ months.   She initially earned $6.75 per hour as an end-of-line inspector. She was later transferred to the job of quality technician and received a raise to $7.25 an hour.

According to McCain, at about 1:00 p.m. on Champion's last day of work, he received a phone call from either Mandi Bell or Charlene Leath that Champion was upset, crying, and wanted to quit.  (McCain Depo. 71.)  He was told by the office that Champion said she was having problems with the people on the end of the line and "she is tired of it and she wants to quit."  *Id.* at 72.  Although the plaintiffs do not dispute this conversation took place, they state that McCain actually fired Champion.

The parties agree that McCain and Darla Hall from human resources met with Champion in Hall's office.  Champion testified that on April 20, 2005, McCain called her into his office and fired her, stating the decision came from "higher up."  (Champion Depo. 95-97, 178.)  McCain testified that he tried to talk her out of quitting, but the plaintiff states that when she left the company, she asked him, "So I'm – I'm fired," to which he responded "yes." (Champion Depo. 98.)  Champion testified: "Not one time while I was in that office did it ever come out of my mouth that I quit.  Not one time that day did it ever come out of my mouth anything about quitting."  *Id.* at 108.

During Champion's employment, McCain was not aware of any EEOC charges filed

11

by her.  Champion tried to claim unemployment benefits, but her request was denied due to the company's statement that she quit.  Champion did not appeal that determination and received no unemployment benefits.  Champion worked for the defendant a total of about 3½ months.

*Becky Baker*:  Baker, a black female,  was hired on January 17, 2005 as a quality assurance technician at a wage of  $7.25 an hour.  McCain, her supervisor, specifically recommended her for this position because of her previous experience in the quality field at the  Gulf States Steel plant in Gadsden.  As a quality technician, it was Baker's job to stop the process if there was a quality control issue, such as incorrect labeling. (McCain Depo. 129.)  Shortly after Baker's employment began, Decatur Plastics began to experience quality control issues and complaints from its major customer regarding mislabeled parts.

The defendant insists that on April 4, 2005, Baker was counseled verbally about misidentification of parts.  Baker has testified that that did not occur.  (Baker Depo. 136.)  On April 8, 2005, a memorandum was issued to all end-of-the line inspectors and quality assurance personnel concerning misidentification of parts.  Baker states that she does not recall seeing the memo, but does not deny that it was issued.

On or about April 19, 2005, Baker was transferred to a "100 percenter" position, and Champion took over Baker's quality technician position. Champion did better at catching labeling issues, and, unlike Baker, she did not have a problem stopping the process if necessary.  If Champion saw a problem, "she would raise her hand and say wait a minute, whoa, stop, this isn't right." (McCain Depo. 33-34.)  McCain testified that the stoppages often resulted in arguments, but they stopped the problems before they reached the customers.  *Id.*

12

The defendant contends that when Baker was a quality technician, she never stopped the line because she did not want to start problems with the ladies who were working on the parts and labeling boxes.  Baker disputes this account saying that the reason she did not stop the line was because if she did and said that something was not right, McCain would undermine her and say that it was.  (Baker Depo. 54-55.)

When McCain told Champion he was taking her out of the quality technician position and moving her to a "100 Percenter" position, Baker said she felt that there was some racial factors at work.  McCain explained that his reasons were her performance.  McCain advised Baker to go straight to human resources with her concerns about her evaluation or job assignment.  Baker discussed her concerns with Hall at human resources. Hall reviewed Baker's complaint with McCain. She determined that McCain's actions were not racially motivated and made no further report or investigation. Owner Kussman testified that when McCain received a complaint of discrimination, he should immediately contact human resources for an investigation. (Kussman Depo. 23.)

After Champion left her position with the defendant, Baker was returned to the quality technician position on or about April 22, 2005.   Baker asked McCain if she could be paid the same rate as Champion received in her position in quality assurance. Her pay was never raised. (Baker Depo. at 79-80, 83.)

On May 6, 2005, Baker received a written warning concerning misidentification of parts. Baker agrees that she got training from the company to do her job.  Baker admitted that "she and others" did miss some of the labeling errors .  As a quality technician, it was her job to stop it. Despite the repeated warnings, these problems continued.

13

On several occasions, Baker was required to go to the customer's business to inspect the mislabeled parts.  McCain, Baker's supervisor, went through the mislabeled boxes with her to review mistakes. The misidentified parts were stamped "QA1," a stamp used by first shift employees. The second and third shift people are supposed to use a different stamp.

After continued problems, Decatur Plastics was placed on Level Two containment because the defendant was unable to control what they shipped out the door to their customers.  At Level Two containment, the company must hire an outside source to come into its plant and certify its products.  (Messer Depo. 103-104.)

It was Baker's job to ensure that the product met the customer criteria and was properly identified.[6] Baker was terminated because the product continued to go out the door improperly identified.[7] McCain admitted that other first shift employees contributed to the mislabeling problems, and that Kim Joiner, Christy Carroll, and Jeff Jenkins, who are all white, were also at least partially responsible for the continuing quality issues — "labeling, the whole entire process," and they were not fired. (McCain Depo. 39-40, 43, 132.) The defendant disputes, however, that these employees were *as* responsible as Ms. Baker.

McCain admitted that the labeling problems persisted after Baker left, and existed in some form until September, when these problems had grown to the point that he was written up for not effectively correcting the continuing problems in the quality department. (McCain

---

[6]The plaintiffs dispute this fact, yet cite only the Plaintiffs' Exhibit 5 as support, without a pinpoint cite or other explanation.

[7]The plaintiffs dispute this fact, but cite only to a portion of Baker's deposition testimony where she states that she does not remember the entire conversation with McCain.

Depo. 44.)

Earl Smith, the company's liaison with Delphi, confirmed to Messer and McCain that the product rejected by the customer had been stamped by Baker.  (Messer Depo. 183-184.) The customer complaints McCain received were for parts produced on first shift for the most part. (McCain Depo. 66.) While there were some second shift or third shift parts, the majority of the problems concerned Baker's shift.  *Id.*

According to the defendant, McCain met with Baker on May 20, 2005, and terminated her because of inadequate job performance.  In contradiction, Baker testified that McCain told her that her employment ended because "a decision had been made to let all of the indirect labor go." (Baker Depo. 87.)  Baker's EEOC charge states, "The respondent's articulated reason for firing me was that I did not take ownership of the position as quality tech."  Baker worked for the defendant about 4½ months.

*All plaintiffs alleged pay disparity*: Initially, both Champion and Baker earned the same base pay of $7.25 as quality technicians. The defendant performed routine evaluations on employees from which their raises were determined.  Raises were based in large part on total points based on numerous factors, such as quality, productivity, and performance. Based on her evaluation, Baker received a thirty cent per hour raise, while Champion receiving a raise of fifty cents per hour. Both received the same ten cents per hour supervisor's discretionary raise.

The defendant's response to plaintiffs' Interrogatory 2 stated that on April 18, 2005 Baker met with Hall and told her she was being discriminated against because of her race. This declaration of discrimination was based on the fact that on or about April 18, 2005, she had

received a thirty cent per hour increase while Champion, a white female, received a fifty cent per hour increase.  Hall told McCain about Baker's complaint of racial discrimination, and, one day later, on April 19, 2005, McCain transferred Baker from her quality assurance technician position to Champion's 100% Inspector, despite both Champion and Baker's protest of any transfer. (Hall Depo. 16-20, 26, 36.) The defendant filled Baker's quality assurance technician position with Champion, a white female, and paid her twenty cents an hour more than Baker received in that same position.  (Baker Depo. 43-44, 82; Messer Depo. 106.)

When questioned why Baker was returned to a quality technician position if he believed her performance was inadequate, McCain testified Baker performed better than his other employees at the time, including Kimberly Joiner, a white female who replaced Baker after Baker's termination and was paid $7.75 per hour, fifty cents higher than Baker received when starting out in that position. (McCain Depo. 102-105.)

Jelks was assigned to the day shift or first shift.  At times, Jelks worked overtime, which extended to second shift hours. Baker worked second shift a few days as a favor to the company.

Champion was missing work due to family issues.  Messer tried to work with Champion and let her come in during afternoons and evenings to make up her lost hours.  (Messer Depo. 86-87.)[8]  According  to company policy, a first shift employee is allowed a shift differential

_____

[8]The plaintiffs cite Champion's testimony that she came in on second shift at the request of the company.  The plaintiffs have cited no time line associated with this testimony, so it is impossible to tell if the parties are talking about the same incident.

only if the employee is re-assigned from first shift to the second or third shift.  (Bell Depo. 190-191.)   A first shift employee who works second shift only occasionally is not entitled to shift differential.  *Id.* The plaintiffs could not identify any first shift employees who worked over into second shift and got shift differential pay. (Jelks Depo. 88-89.)   Champion was temporarily assigned to second shift for a few days when the company was behind on parts. She does not know of any other employee being assigned to second shift for just a few days who received shift differential pay.

Chuck Maciulewicz was an individual with over twenty years in the quality assurance field, and was hired as a quality assurance engineer.  Earl Smith was the first shift supervisor and was later given the position of quality liaison with customers.

*Erisa and Cobra Claims:* Pursuant to company policy, all employees pay their health insurance premiums a month in advance.  After leaving their employment, all plaintiffs received a refund or reimbursement for all health insurance premiums which were paid in advance and unearned. Company policy and insurance regulations prevented employees from continued coverage post-employment.

Wallace T. Gray is the General Counsel for Key Benefit Administrators ("KBA").  KBA was the third party health insurance administrator for the defendant. KBA received claims on Champion and Jelks while they were employed, but did not receive any claim on Baker at any time.

KBA records and documents show that the COBRA election forms were generated on June 3, 2005 for all three plaintiffs. The plaintiffs state they never received a COBRA notice following their dismissals. (Jelks Depo. 179-180, 182; Champion Depo. 137-138; Baker Depo.

17

120.) These COBRA forms are sent out by first class mail in compliance with COBRA's rules and regulations. If a letter comes back as being undeliverable, the letter is retained. KBA's records show no record of COBRA election packages for the plaintiffs as having been returned.

ANALYSIS

Jelks worked for the defendant about 4½ months.  Champion worked for the defendant a total of about 3½ months.   Baker worked for the defendant about 4½ months.  All of the following claims accrued during those periods.

The disparate pay discrimination claims

Jelks and Baker were black and female, and they claim gender and race discrimination. Champion was white and female and had a bi-racial child.[9] She claims gender and race discrimination. The claims are brought under counts one and two of the complaint.

Adapting the *McDonnell Douglas* prima facie test to the plaintiffs' allegations of discriminatory pay, each plaintiff must prove that: (1) she was a member of a protected group; (2) she received lower wages than (3) similarly situated persons outside the protected group; and (4) she was qualified to receive higher wages.  *MacPherson v. University of Montevallo*, 922 F.2d 766, 774 (11th Cir. 1991).

The claims of disparate pay in this case are that (1) Baker was not paid the same as Champion for the quality technician position; (2) the plaintiffs were not paid shift differential;

---

[9] Champions' race discrimination claims, if they survive at all, must be based upon the theory of associational discrimination recognized by the Eleventh Circuit Court of Appeals in *Parr v. Woodmen of the World Life Ins. Co.,* 791 F.2d 888 (11th Cir. 1986).   To the extent that Champion can show that the defendant or its decision makers were aware that she was the mother of a biracial child, she may be able to meet the first prong of the modified *McDonnell Douglas* test for proving pay or promotion discrimination based on race.  Because the defendant assumes in its argument that the first prong is met, the court will likewise for its analysis.

and (3) certain male co-employees were paid higher wages.

*Baker's discriminatory pay claim:*  Baker claims that she was paid less than Champion, who is white.  Initially, both Champion and Baker earned the same base pay of $7.25 per hour as quality technicians.  The defendant then performed routine employee evaluations.  Raises were based in large part on total points from numerous factors, including quality, productivity, and performance.  Based on her evaluation, Baker received a thirty cent per hour raise, compared to Champion's raise of fifty cents per hour. Both Baker and Chapman received the same ten cent per hour supervisor's discretionary raise.

Eventually, Baker moved to a different position.  After Champion left her position with the defendant, Baker was returned to the quality technician position on or about April 22, 2005.  There is no evidence that any intervening evaluations were performed or raises given in the 4½ months that Jelks worked for the defendant.  Accordingly, Baker was being paid the same rate as when she was a quality technician.  Baker asked McCain if she could be paid at the rate Champion was paid when she was in the quality tech position. Baker's pay was not raised.

The plaintiffs argue first that this pay disparity was caused by racial bias in the evaluation process. They argue, "QA Mgr. McCain's discriminatory bias in filling out the evaluation that resulted in the unequal pay to Baker is evidenced by the fact that McCain gave Champion a higher evaluation score than Baker."

Federal law specifically provides:

Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide

seniority or merit system, or a system which measures earnings by quantity or quality of production or to employees who work in different locations, provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin, nor shall it be an unlawful employment practice for an employer to give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results is not designed, intended or used to discriminate because of race, color, religion, sex or national origin. It shall not be an unlawful employment practice under this subchapter for any employer to differentiate upon the basis of sex in determining the amount of the wages or compensation paid or to be paid to employees of such employer if such differentiation is authorized by the provisions of section 206(d) of Title 29.

42 U.S.C.A. § 2000e-2(h).

The fact, by itself, that an employee who is a member of a protected group received a worse evaluation than an employee not in the protected group is not evidence of racial discrimination. It is undisputed that the evaluation led directly to the pay disparity. *The plaintiffs provide no evidence that the evaluation itself was tainted with discrimination, or that it was otherwise flawed.*

The plaintiff next argues that she was the victim of discriminatory pay because after Baker left the defendant's employ, Kimberly Joiner replaced her and made 20 cents per hour more than Baker. Again, there is no evidence that Joiner had the same qualifications as the plaintiff, or that Joiner was white, received the same review, or was similarly situated. The argument that Earl Smith's higher pay demonstrates racial animus is similarly without merit. Baker's disparate pay claims are due to be dismissed.

*Plaintiffs' shift differential claim:* The plaintiffs argue that because they occasionally worked overtime — from first shift into second shift — they should have received overtime pay based on a second shift differential. The defendant argues that no first shift employee who works second shift only occasionally is entitled to shift differential pay. The plaintiffs have

20

failed to respond to this argument in their summary judgment submissions.

Bell testified that a first shift employee who works second shift only occasionally is not entitled to shift differential pay. Further, the plaintiffs could not identify any employees on first shift who worked over into second shift and got second shift differential pay. The plaintiffs' disparate pay claims based on this ground are without merit.

*Higher paid male co-employees claim:* Chuck Maciulewicz was an individual with over twenty years in the quality assurance field, and was hired as a Quality Assurance Engineer. Earl Smith was the first shift supervisor, and he was later given the position of quality liaison with customers. The defendant argues that these two employees are not valid comparators. The plaintiffs have failed to respond to this argument.

A plaintiff seeking to demonstrate that similarly situated employees were treated differently must produce evidence that her comparators were "similarly situated" in all relevant respects. *Gibbons v. Auburn University at Montgomery*, 108 F.Supp.2d 1311, 1318 (M.D.Ala. 2000), citing *Holifield v. Reno*, *supra*, at 1562. Comparators with more experience are not valid comparators when analyzing a employment discrimination claim. *Daniel v. Church's Chicken*, 942 F.Supp. 533 (S.D.Ala. 1996), *citing Morgan v. City of Jasper*, 959 F.2d 1542, 1545 (11th Cir. 1992). The plaintiffs have made no such showing.

Moreover, Maciulewicz had long experience in the quality assurance field when he was hired as a quality assurance engineer, and Smith was the first shift supervisor and he was later promoted to quality liaison with customers. The alleged comparators are not similarly situated in all material and relevant aspects to the plaintiffs. The comparators identified by the plaintiffs held different positions requiring different responsibilities. Any claim the plaintiffs

have based upon these comparators is due to be dismissed.

Discriminatory Promotion Claims

In counts one and two, Jelks claims that she was denied a promotion to flock technician and to sprayer.  To establish a *prima facie* case of discrimination in a promotional decision, a plaintiff must prove (1) that she is a member of a protected minority; (2) that she was qualified and applied for the promotion; (3) that she was rejected despite these qualifications; and (4) other equally or less qualified employees who are not members of the protected minority were promoted.  *Lee v. GTE Florida, Inc.*, 226 F.3d 1249 (11th Cir. 2000). Where the defendant has stated a legitimate, non-discriminatory reason for the action taken, courts have articulated the evidentiary burden a plaintiff must meet in order to prove pretext in a discriminatory promotion case. The plaintiff must show that she was substantially more qualified than the person promoted.  *Lee*, 226 F.3d at 1254.  "[T]he test is whether the disparities in qualifications are of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." *Higgins v. Tyson Foods, Inc.*, No. 04-14749, 2006 WL 2466178 *2 (11th Cir. August 28, 2006).  "This evidentiary standard does not alter the plaintiff's evidentiary burden to prove the fact of intentional discrimination by a preponderance of the evidence. Instead, the standard only describes the character of this particular type of evidence that will be probative of that ultimate fact."  *Id.* at *3.

*Jelks' flock tech claim:* Jelks expressed interest in the flock technician position, which is a grade position requiring some skill and some experience. (Hall, pp. 89-90).  A flock technician is required to "perform preventive maintenance on equipment" and "rebuild

22

equipment as required." (Job Description for Flocking Technician.) Messer hired Jeff Morgan, a white male. Messer knew Jelks was interested in the position, but Jelks did not have any experience in operating spray equipment, mechanical repair, or maintenance work on equipment. Messer admitted that little consideration was given Jelks.

Messer's stated reason for hiring Morgan was because of his extensive experience with painting and operation of paint equipment like the one he would use as a flock technician. The glue gun used by a flock technician and the paint gun used by Morgan in his previous jobs were very similar. Morgan's experience, knowledge, and background in the use and operation of spray equipment were important factors in Messer's decision to hire Morgan for the Flock Technician position.

While Messer, McCain, Bell, and Tidwell all agreed that in her 4½ months working for the defendant that Jelks performed well as a flocker, Messer observed Jelks as having attendance problems, production problems, and "being off the line" problems. He also had concerns about the attitude and ability of Jelks to work and to cooperate with co-employees. At that time the flockers, including Jelks, were not getting along. Messer could not name anything that Jelks did to distinguish her from other employees in this regard.

Jelks testified that Messer told her it was her job to show new flockers, who finished the Gadsden training classes, how to do that job. The plaintiff argues that since the job description of flock tech also states that a flock tech must "train adhesive/flock operators and flock-line inspectors on their assigned jobs," she was already doing the job, and, therefore, was qualified. However, nothing about her testimony establishes whether what she did amounts to the same thing as what the job description calls for, how important that requirement was

to the job, or whether she did it well.

Further, the plaintiff argues she was more qualified than Morgan because Morgan had no prior flocking experience and had to be trained after he was promoted. There is no evidence that prior flocking experience was a requirement for the promotion. Neither is there evidence that having such experience made Jelks as qualified as Morgan. Additionally, the fact that Jelks had been working at the plant for only a few months undercuts her argument that she had any kind of extensive flocking experience.

Last, the argument that Chris Hill was promoted to flock tech from flocker without any maintenance experience is without merit. The plaintiff has presented no evidence as to Hill's other qualifications for the position, or any comparisons of Hill's qualifications with her own. As to all of these comparators, the plaintiff has failed to show disparities in qualifications of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen these persons over the plaintiff.  All claims based on Jelks not receiving the flock tech position are due to be dismissed.

*Jelks' sprayer position claim:*[10]  With respect to direct evidence of discrimination regarding the sprayer position,  the Eleventh Circuit has stated:

> We define direct evidence of discrimination as evidence that reflects "a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir.2004) (quoting *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1358 (11th Cir.1999)) (internal quotation marks omitted). "[O]nly the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age, ... constitute direct evidence of discrimination." *City of Miami*, 870 F.2d at 582; see also

---

[10]The plaintiff refers to this position as a lateral move.  However, the parties seem to agree that without such a move the plaintiff could never have gained sprayer experience to qualify her for an eventual flock tech position.

*Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189-90 (11th Cir.1997) (listing cases where we have concluded that remarks and actions constitute direct evidence of illegal discrimination). "In the face of direct evidence, an employer must prove that the same employment decision would have been made absent any discriminatory intent." *City of Miami*, 870 F.2d at 582.

*Van Voorhis v. Hillsborough County Bd. of County Com'rs*, 512 F.3d 1296, 1300 (11th Cir. 2008).

In a long line of cases, this Court has found direct evidence where "actions or statements of an employer reflect[ ] a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." *Caban-Wheeler v. Elsea*, 904 F.2d 1549, 1555 (11th Cir.1990). *See Haynes v. W.C. Caye & Co., Inc.*, 52 F.3d 928, 930 (11th Cir.1995) (holding that statement questioning whether "sweet little old lady could get tough enough" to do job and statement that "a woman was not competent enough to do this job" constitute direct evidence); *Burns v. Gadsden State Community College*, 908 F.2d 1512, 1518 (11th Cir.1990) (holding that statement that "no woman would be named to a B scheduled job" constitutes direct evidence); *Caban-Wheeler*, 904 F.2d at 1555 (holding that defendant's statement that program needed a black director constitutes direct evidence); *E.E.O.C. v. Alton Packaging Corp.*, 901 F.2d 920, 923 (11th Cir.1990) (holding that general manager's statement that "if it was his company, 1190 he wouldn't hire any black people" and production manager's statement that "you people can't do a ---- thing right" constitute direct evidence); *E.E.O.C. v. Beverage Canners, Inc.*, 897 F.2d 1067, 1068 n. 3, 1072 (11th Cir.1990) (holding that plant manager's constant barrage of racial slurs and statements such as "[t]hose niggers out there will not get anywhere in this company" constitute direct evidence); *Sennello v. Reserve Life Ins. Co.*, 872 F.2d 393, 394, 395 (11th Cir.1989) (holding that statement that "we can't have women in management" constitutes direct evidence); *Walters v. City of Atlanta*, 803 F.2d 1135, 1141-42 (11th Cir.1986) (holding that memorandum requesting a new list of candidates because "current register ... does not include any minority group representation" constitutes direct evidence); *Wilson v. City of Aliceville*, 779 F.2d 631, 633, 636 (11th Cir.1986) (holding that mayor's statement that "he wasn't gonna let no Federal government make him hire no god-dam nigger" constitutes direct evidence); *Thompkins v. Morris Brown College*, 752 F.2d 558, 561, 563 (11th Cir.1985) (holding that college president's statement that he saw no reason for a woman to have a second job and statement that males had families and needs that female plaintiff did not constitute direct evidence); *Miles v. M.N.C. Corp.*, 750 F.2d 867, 874-75 (11th Cir.1985) (holding that plant manager's statement that he wouldn't hire blacks because "[h]alf of them weren't worth a shit" constitutes direct evidence); *Bell v. Birmingham Linen Serv.*, 715 F.2d 1552, 1553, 1557 (11th Cir.1983) (holding that supervisor's statement that he would not put woman in washerman position because "every woman in the plant would want to go into the washroom" constitutes direct evidence); but see *Harris*, 99 F.3d at 1082, 1083 n. 2 (holding that statement that "under the circumstances we did not need to employ a black at Thompson High School" open to more than one interpretation and thus not

25

direct evidence).

*Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189-1190 (11th Cir. 1997).

The evidence, when viewed in the light most favorable to the plaintiff, shows that Jelks asked for a lateral move to the sprayer position. Messer told Jelks that "the parts are for a man to handle [and] that a woman should not work in that position," and that  "that job was not for women. It was only for men." (Jelks Depo. 136, 139.)  Messer testified that he may have had a conversation like this with the plaintiff.   (Messer Depo. 116-117.)   The plaintiff has presented direct evidence of discriminatory intent based upon gender with regards to the Sprayer position.  The defendant makes no showing in response. Jelks' gender discrimination claim regarding the sprayer position should go forward on the basis that there is direct evidence of such discrimination.

<u>Claims of discrimination regarding their separation from employment</u>

*Jelks' claim*: Under *McDonnell Douglas*, a plaintiff establishes a prima facie case of employment discrimination by showing that (1) she belongs to a protected class; (2) she was subjected to adverse job action; (3) the employer treated similarly situated employees outside her class  more favorably; and (4) she was qualified to do the job." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) (citing *McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S.Ct. at 1824).  Whether a plaintiff is similarly situated with non-protected members is a crucial  issue in a discipline or termination case.  *Marshall v. Western Grain Co., Inc.*, 838 F.2d 1165, 1168 (11th Cir.), *cert. denied*, 488 U.S. 852, 103 L.Ed.2d 110, 109 S.Ct. 137 (1988). To prove a *prima facie* case of discriminatory discharge, the plaintiff must show that she was discharged for misconduct nearly identical to that engaged in by one outside of the protected class whom

26

the employer retained. *Hawkins v. Ceco Corp.*, 883 F.2d 977, 984 (11th Cir. 1989). When the "plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present." *Holifield v. Reno, supra,* at 1562, *citing Mack v. Great Atlantic and Pacific Tea Co.,* 871 F. 2d 179, 182 (1st Cir. 1989).

Once the defendant offers a legitimate reason for the plaintiff's termination the presumption of discrimination disappears. *Robertson v. Ala. Dep't of Economic and Community Affairs,* 902 F.Supp. 1473, 1483 (M.D.Ala. 1995), *citing St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993). This burden is one of production, not persuasion, *id,* and it is exceedingly light, *Hendricks v. Baptist Health Services*, 278 F.Supp.2d 1276, 1287 (M.D.Ala. 2003), citing *Holifield v. Reno*, *supra,* at 1564. As the Eleventh Circuit has repeatedly held, an employer may terminate an employee for a good reason, bad reason, or no reason, as long as the action was not discriminatory. *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999).

Under *McDonnell Douglas*, once the defendant articulates a legitimate, non-discriminatory reason for its actions, "the plaintiff must then present concrete evidence in the form of specific facts which show that the defendant's proffered reason is false and mere pretext." *St. Mary's Honor Center v. Hicks*, *supra.* At this stage, mere conclusory allegations and assertions will not suffice. *Id.* The plaintiff's burden goes beyond merely establishing that the reasons offered by the defendant for its decision are not worthy of belief or that the plaintiff or the court should substitute its judgment or opinion for that of the defendant. *Id.* Instead, the plaintiff bears the "ultimate burden of persuasion" that her race and/or age was the true reason for the challenged action. *Mary's Honor Center v. Hicks*, 509 U.S. at 499. At

27

this stage, mere conclusory allegations and assertions will not suffice.  *Id.*  The court is not to second-guess the decisions made by employers in the course of their business.  *Damon*, 196 F.3d at 1361.  The courts are not in the business of  judging whether the employment decisions are prudent or fair.  *Id.*  Instead, the sole concern is whether unlawful discriminatory animus motivated the challenged employment decision.  *Id.*

The stated reason for Jelks' dismissal was insubordination.  Josh Tidwell was one of Jelks' supervisors at the time of her termination on or about May 25, 2005.  According to Tidwell, Jelks was supposed to stay on the line until the end of the first shift, which is 3:30 p.m.  At about 3:15 p.m. on the day in question Tidwell noticed the production line was not running parts.  There is one sprayer and one flocker on each shift.  If either of them is absent, the line does not run. On this date, Tidwell observed that the sprayer was at his work station, but Jelks was not at hers.  Tidwell went to look for Jelks, and he states that he found her in the parking lot, before the end of her shift, sitting in her car.  Jelks' testimony is that she was found her off the line, but on her way to get a broom to clean up her station.

The parties agree that Tidwell told Jelks to return to the line, and that Jelks refused and said she was finished for the day.  Jelks testified:

> So I stop at 3:15 and we are to clean up until 3:30, something I've been doing since day one.  It's our routine. I stop at 3:15. We're cleaning up. And normally we have to walk and go get our brooms and I think I had went to get the broom and I come back and Josh said, "Why are you not running parts" and I was like "We're finished for today." He said, "You're not finished. Get back up there and run parts" and I was like, "Josh, we're finished."

(Jelks Depo. 144.) Jelks states that she clocked out at 3:30, the end of her shift. It is undisputed that the production line did not run from 3:15 to 3:30.  (Tidwell Depo. 110.)

Tidwell fired Jelks.  There is no evidence that Messer had to concur in order for the

termination to go through.  Tidwell testified that Mr. Messer didn't say anything regarding Tidwell's decision.  (Tidwell Depo. 92-93.)  When asked about Tidwell firing Jelks, Messer testified: "He had fired her.  I didn't do the firing."  (Messer Depo. 42.)

The reason for the termination was insubordination.  Notably, the plaintiff does not deny that she did not work the line the remainder of the shift.  She contends simply that it was common practice for employees to leave their positions at 3:15 and get ready to clean up.  She also does not deny that when she was told to return to the line that she refused and said she was "finished for the day."  The only part of Tidwell's testimony that the plaintiff denies is the assertion that he found her in the parking lot.  Accordingly, the plaintiff does not present evidence that the stated reason for her termination – insubordination – is false.

As evidence of pretext, the plaintiff merely argues that Messer's general comments regarding race and women show that race was the real reason for the termination. She argues:

> [P]ersons involved in an employment decision at issue must be clean of discriminatory animus, because their prejudices infect all decisions they make with bias. In *Ross v. Rhodes Furniture*, 146 F.3d 1286, 1291 (11th Cir. 1998), one of the decision makers made a racial comment in 1990 and, although Rhodes was not fired until 1994, the Eleventh Circuit held that single racial statement constituted circumstantial evidence of discrimination and could persuade a jury to disbelieve the defendant's proffered reason. *Rhodes*, 1462 F.3d at 1291. Decision-makers' racists attitudes improperly tainted performance reviews and shows bias against African-Americans. *See, e.g., Damon v. Fleming Supermarkets of Florida*, 196 F.3d 1354, 1359, 1362 (11th Cir. 1999).

(Pls' Br. 14-15.)  However, there is no evidence in this case that Messer made the decision to terminate Jelks.  That decision was made by Tidwell.

*Baker's discharge*: Baker was discharged for continued performance problems, which occurred over the course of the 4½ months she worked for the defendant. She admits that "she and others" missed some of the labeling errors.  As a quality technician,  it was her job

to stop these errors and make sure that the product got to the customer with the correct product labels.  Before her termination, Baker was given a verbal warning on April 4, 2005 and a written warning on May 5, 2005.  Her supervisor offered job training sessions to assist her in identifying and preventing problems and at one time went through the mislabeled boxes with her to explain the mistakes.  Despite the attempts to counsel Baker and correct the mislabeling problem, the problem persisted.  Because of this problem, the customer placed Decatur Plastics on Level Two containment. At Level Two containment the company has to pay an outside source to come into its plant and certify the product. Messer states that Baker was terminated because the product continued to go out the door improperly identified.

The plaintiff argues that these problems cannot be blamed solely on Baker.  However, it is undisputed that her job was to stop these errors and the errors continued. The fact, if it is a fact, that the plaintiff was told she was being "let go" because all "indirect labor" was being eliminated does not negate the other reason given by the defendant. The plaintiff has the burden of pointing to evidence sufficient to create an issue as to whether each and every reason given by the defendant was mere pretext for the real reason of discrimination. *Combs v. Meadowcraft, Inc.*, 106 F.3d 1519 (11th Cir. 1997).  Accordingly, the evidence is insufficient to support a finding of pretext in this case.[11]

*Champion's claims*: The only argument the defendant makes regarding Champion's claim of discriminatory termination is that no adverse employment action was taken against her: she quit her job. The plaintiff testified that she did no quit, and was told that she was

---

[11]Messer's alleged comments would be relevant only as evidence of pretext, which the plaintiff has not shown.  In any event, the evidence is undisputed that it was McCain who terminated Baker.

fired.  Champion's claim is due to survive the defendant's motion for summary judgment.

<u>Plaintiffs' claims of retaliation regarding their separation from employment</u>

Under Title VII, it is unlawful for an employer to discriminate against an employee "because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing." 42 U.S.C. §2000e-3(a).  Applying the same *McDonnell* burden-shifting framework, to establish a prima facie showing of retaliation under Title VII, the plaintiff must show that (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) there is a causal connection between the two events.  *Cooper v. Southern Co.*, 390 F.3d 695, 740 (11th Cir. 2004).  However, the defendant may rebut the prima facie case by offering a legitimate, non-discriminatory reason for the plaintiff's termination.  *Id.*

The defendant argues that there is no evidence that the plaintiffs took part in any statutorily protected activity.  However, even assuming that the plaintiffs did, as shown above, as to plaintiffs Jelks and Baker, there has been no successful showing of pretext.  Accordingly, the motion for summary judgment is due to be granted as to these plaintiffs' claims.

Champion testified that she spoke to Mary Ann Snyder, who worked in human resources, and Messer about the latter's racially offensive comments.  Also Champion told owner Kussman "that there was some racial influential [sic] going around the plant that he needed to talk to his management about because it was coming out of their mouths." (Champion Depo. 78-82.)  The defendant does not dispute that these discussions would constitute protected activities.  It states only that the plaintiffs' testimony alone is insufficient

to establish that these discussions occurred. That argument is without merit.  For purposes of this motion, the plaintiffs engaged in protected activity.

Although the plaintiffs need establish only that the protected activity and adverse action are not wholly unrelated, *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993), they must still, at a minimum, establish that the decision-maker was actually aware of the protected expression at the time he took the adverse employment action, and that there was a close temporal proximity between the awareness and the adverse employment action. *Hendricks v. Baptist Health Services*, 278 F.Supp.2d 1276, 1287 (M.D.Ala. 2003),  *citing Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1336 (11th Cir. 1999).

Champion testified that Messer terminated her.  At least one of her complaints went to Messer.  The defendant argues only that Champion was not terminated, rather she quit. Champion's retaliation claims will survive summary judgment.

### Plaintiffs' claims under COBRA

The plaintiffs claim that the defendant did not comply with the provision of 29 U.S.C. § 1166(a)(4)(A) that requires plan administrations to notify former employees of their right to receive continuation coverage.  The plaintiffs have all testified that they never received a COBRA notice following their termination.  The plaintiffs fail to provide any evidence that the defendant is a plan administrator subject to these requirements.  Accordingly, this claim is due to be dismissed.

### ERISA Claims

Section 510 of ERISA makes it unlawful to "discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary ... of an employee benefit plan ... for the

purpose of interfering with the attainment of any right to which such participant may become entitled under the plan."  29 U.S.C. §1140. This section prohibits interference with both present pension benefits and future entitlements to receive benefits.  *See Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1222 (11th Cir.1993).  The plaintiffs have failed to demonstrate that they have exhausted their  administrative remedies before suing the defendant for alleged violations of ERISA.  Exhaustion of administrative remedies is a prerequisite to filing an ERISA lawsuit.   *See Kross v. Western Electric Company, Inc.*, 701 F.2d 1238 (7th Cir.1983).  The plaintiffs have never appealed or requested review of any alleged denial of a claim.

## CONCLUSION

Wherefore, the defendant's motion for summary judgment is due to be GRANTED on all of the plaintiffs' claims, except 1) Jelks' claim that she was denied promotion to sprayer due to gender discrimination; 2) Champion's claim that she was terminated due to gender discrimination; and 3) Champion's claim of retaliatory termination. The motion for summary judgment is due to be denied as to these three claims.

An appropriate order will be entered.

DONE this 30th day of September, 2008.

Robert R. Armstrong, Jr.
United States Magistrate Judge